Case number 20-1295, et al. Xcel Energy Services, Inc. Petitioner v. Federal Energy Regulatory Commission. Mr. Killian for the petitioner, Mr. Fish for the respondent. Mr. Killian, good morning. Yes, good morning, Your Honor, and may it please the court. Under Section 205 of the Federal Power Act, public utilities have to treat all their customers equally. And at this point in the case, I think there's no dispute that under Section 205, the replacement procedures at issue here treat all customers equally. FERC has conceded that the procedures do not discriminate among existing generators already connected to PSCO's grid. Every existing generator is allowed to use the procedures, and PSCO would have no discretion to refuse them that right. The procedures also do not discriminate against new generators who want to connect to the grid. As FERC found in this case, and frankly in every other, the new and existing generators are simply not similarly situated for purposes of interconnection. And when entities are not similarly situated, there can be no discrimination as a matter of law. And so the replacement procedures satisfy Section 205. They're also highly- Oh, hang on. The Federal Power Act prohibits undue preference, undue preferences, not just entities, but undue preferences. And the commission's order here used that phrase, undue preference. And when it talked about discrimination, it said, discrimination in favor of PSColorado's own generators. So it really was using discrimination. There was another form of word for undue preference for PSColorado's own generators. Now, if that's right, then that's a form of behavior that is in terms prohibited by the Power Act. Is it not? I don't think so, Your Honor, for a few reasons. FERC has used, in this case and in other cases, the concept of preferential and discriminatory treatment as the same thing. Section 205 and 206 of the Federal Power Act are interpreted in pari materia. And whether something is a preference or discrimination or an advantage, in essence, the question is, is there someone who is being advantaged over someone else similarly situated who is being disadvantaged? And so I think the analysis is essentially the same. Well, no, but the concept is, I think it may change with the baseline for whom the comparators are. If you're talking, imagine, I know this isn't your case, but imagine you have a non-independent generator like PSColorado. And it owns 99% of the existing generation capacity. There's one other non-affiliated generator. And it proposes a scheme that says, we're going to make things so much easier for existing generators to hang on to the places that they already have in the interconnected grid. They're going to get to hang on to their connection points by making it super easy for them to modify and update. Now, that clearly, how is that in that 99% or 99 out of 100 generators? To the extent that allows them to hang on, cement their position for the foreseeable future on that grid, that necessarily shuts out new generation coming in in a way that might not happen. So I think the last generators had to compete on even playing field with new generators. Would that be, I'm not even going to use the adjective undo, but would that be a preference? Would that scheme prefer existing generation, 99% of which is owned by the operator? No, I don't believe so, Your Honor. And the reason I resist the conclusion is that I don't think the last step of the analysis is right, that this even-handed procedure, which would apply even to that one non-affiliated generator, the exact same way that it applies to the 99 affiliated generators in your hypothetical, would be a preference unless these new generators were somehow similarly situated. The point of interconnection, as FERC identified in order number 2003, the point of the interconnection queue, I should say, was to provide a neutral and fair way to get new generators onto the grid. As FERC recognized in the Mid-Continent case, what we're dealing with here is essentially an oversight in the pro forma tariff that at the time no one anticipated, no one was thinking about the fact that you would have replacements one day in the future, replacements that aren't really a modification in the sense that the pro forma tariff uses that concept, and replacements that aren't a new interconnection request either because the entities are already interconnected. And so section 205, which is the only provision that's really at issue here... Just to be clear, your view is FERC does not have the power to say that a self-interested operator wants to set up this sort of rule change, this approach, this analytical change in a way that locks in its own generators at the expense of opportunities even for new generators to connect at all. FERC can do nothing about that. Again, I want to just push back on that last that there's no opportunity for new generators to connect. They still have the exact same opportunity that order 2003 guarantees them. They don't have the exact same opportunity they would have if those 99 owned, privately owned, operator-owned, shall we say, generators had to compete for, as if they were competing for a new connection, had to compete with them for connections. Well, I think, well, number one, I don't think there's any evidence in the record that that's actually what's going on here, or even in the case of the 99 in your honor's hypothetical. The interconnection service is just a connection between an existing generator and the grid. If a new generator wants to provide power to the grid, then it just needs to be interconnected. It's not necessarily that they're going to reuse someone else's interconnection, and if the grid needs more power, the grid will obtain more power. But it's easier if you reuse. Then it's easier to, you're not going to have to build new structure for the grid. You're not going to have to worry about overload on the grid. So it is different. It is different, and those benefits are nearer to rate payers who don't have to pay for the, you know, unnecessary reconnections and building a brand new interconnection facilities in different places on the grid, which is why rate payers in states are highly supportive of these procedures where they've been adopted throughout the United States. If FERC said in the 99 case, if FERC said that design, the design of that scheme, design of that proposal undermines Order 2003's goal of facilitating market entry, and it does so in the hands of the very entities that Order 2003 was most concerned about engaging in self-help, self-preference. And so if they said, if they said that in order, so because it undermines Order 2003's goals in those two respects, we're striking it down. I'm not asking whether that's what they said in this order. I'm just asking in my hypothetical, would that be sufficient? I think that would put FERC in the position of reaching a result that's inconsistent with the one it reached in the MISO decision and every other one, because the nature of this procedure, whether the operator is affiliated. I just want to ask whether if they, let's pretend it's the first decision they make on this subject. They put aside inconsistent with precedent. The first time this idea comes up, it's not MISO, but it comes up in my hypothetical company, Axe. Would that be a sufficient basis for rejecting it? And our first order argument is that would be insufficient because it is still a neutral and even-handed procedure. The point of Section 205 when it was adopted in the 1930s and when it was integrated utilities and require them not to give, not to adopt neutral procedures. And the procedure would be facially neutral. There is no opportunity to discriminate in the application of the procedure. And as FERC found in all these other cases, the entities who are claiming to be affected by it, negatively affected by it, are just not similarly situated for purposes of the procedure. And so our first order argument, Judge Millett, is that no, that would be impermissible construction of the statute. But a second order argument is that it would put that determination squarely inconsistent with the one in MISO because by the nature of this generator replacement procedure, yes, it is going to be used by existing generators. That's what it means to, you know, you have to be an existing generator in order to be in the position to replace in first instance. And so on the MISO grid, which is orders of magnitude larger than PSCO's grid, every existing generator there is going to get the same, you know, advantage and putting air quotes around that because that's what it means to be an existing generator. And so FERC... Is part of your argument that your approach would in some way help new generators by clearing out the queue? Yes, that is part of the argument. FERC found that in the mid-continent. Can you explain? I don't understand exactly how that would work. Yeah, so under the current pro forma tariff, because of replacement request is treated like a new interconnection request, new interconnection requests have to go into the queue and replacement requests have to go into the queue. And it takes a long time to process these requests through the queue. So by removing the generator replacement requests from the queue, the queue then becomes focused only on new generators. And so any new generator doesn't have to wait behind a replacement request in order to get through the queue. I'm just going to make up numbers, but would it work something like this? Imagine the queue has three generators in it. New generator is first, existing is second, and then new generator is third. And each of those takes a year to process. And if you take that second one out of the queue, then the third in the queue, new generator number two, gets processed after one year rather than after two years. That's it. Following your... Okay, I'm going to ask FERC if they think that's actually correct. Thanks for the clarification. Absolutely. That's our understanding, which is why this isn't a totally one-sided benefit. Is that right? What happens to the time? It still takes time to process the existing generators, correct? The existing... In grids where the replacement procedure is put in place, they're handled like a modification request, which means they're not done through the queue. They're done. Okay. But the resources are still being expended and diverted to that process. It can't be quite as clean as was suggested. You have to spend time doing paperwork and processing and making decisions about it, right? Yeah. But I think the fundamental importance, Judge Millett, is that in the interconnection queue, you have to study them one at a time because once then gets connected, the first one is connected to the grid, you have a new grid. And so now you analyze this, whoever's now at the front of the queue, not for what the whoever's behind it has a brand new grid. And I thought sometimes they could do them in groups. Is that not right? I think that may be possible, but my understanding is they are typically seriatim, whereas the modification requests or the replacement request is simply a very abbreviated analysis. Are you changing your interconnection? Is the load going to change? And to Judge Walker's question, if you don't satisfy that requirement, if your replacement will in fact have a material impact on the grid, then you got to get back in the queue, just like everybody else. So the grid then becomes focused only on generators who are going to have an effect that changes the grid in some way. Simply maintaining the status quo, which is done through modification requests right now, and then would also be done through replacement requests, are handled in this abbreviated fashion. In the queue as it exists, if what happens is you have someone who's already in the grid and they retire their generator, they just retire it. They're not replacing it or modifying it. They just retire it. And then you take up the person who's next in the line of the queue. Will their process go faster? Because let's assume that they're not going to generate more power onto the grid than the retired one did. Would that not facilitate their process? I would say it's possible, but it's not guaranteed, because each of the interconnections is geographically based as well. And so if a generator connected in the northwest corner retires and the next one in the queue wants to be in the southeast corner of the grid, there may be no benefit, if you want to call it, no way to abbreviate the analysis. The place on the grid where the new load is introduced is not the most important part, a very important part of the analysis, which is another reason why these replacement requests aren't necessarily going to benefit any new generators. But I guess I just want to emphasize this point. I've run over my time, but before I sit down, I'd like to emphasize this point. I think FERC's construction of Section 205 here, which essentially says that our affiliate's that renders the procedures unlawful, that turns Section 205 on its head. FERC is saying that this is discriminatory or preferential because everyone could take advantage of it. And that is absurd. We don't have to discriminate against our affiliates. We don't have to carve our affiliates out of neutral procedures in order to satisfy a non-discrimination duty. And that is essentially what FERC has held here and what FERC advances in the court now, that the only way for us to not discriminate is to discriminate. And that's illogical. It's the essential reasoning beneath the order here, which is why this is the only order where FERC has rejected one of these procedures for that reason. It's also the only application that involves administration by a non-independent, self-interested. We were the first, not the only. Dominion has an independent entity to its administration. Is there another one that has, it's like you, it's not independent and it doesn't have an independent entity doing the administration that they have? Not that I'm aware of Judge Millett. No, you're just, you're different. You're not similarly situated to the others. I strongly resist that conclusion, Your Honor, because the difference between being affiliated and unaffiliated doesn't affect whether or not the practice is discriminatory. If the practice is neutral on one of the largest grids in the United States, it's the fact that we are affiliated with 60% of the existing generators does not turn it into a discriminatory practice on our small grid in Colorado. And so because it doesn't violate the statute and because the procedure generates the exact same very large systemic benefits on Piesco's grid that it generates on Miso's grid, FERC cannot conclude that this is somehow not consistent with or superior to the pro forma tariff. The conclusion below for that reason is arbitrary, capricious and contrary to law. Okay, we'll give you a couple minutes and reply. Mr. Fish. Thank you. Good morning, Your Honors, and may it please the Court, Jared Fish for the Commission. Mr. Killian just said that everyone can take advantage of their streamlined review policy. The only way he can say that is if he restricts the universe we're considering to existing generation and forgets about its, P.S. Colorado's policy's effect on new generation. That rests on an erroneous premise that this entire case turns on. And that erroneous premise is that new resources seeking to interconnect to P.S. Colorado's grid are not similarly situated to existing resources that seek to replace their generating facilities. Mr. Fish, can you pick up where Mr. Killian left off with regard to the independent entity that could be ordered to oversee the replacement of existing generation? It's just unclear to me how that helps new generators at all. Because in Dominion, the independent entity is there, I suppose, to make sure that Dominion doesn't discriminate between its own existing generators and other companies' existing generators. But that independent entity isn't involved at all, as I understand it, in the process for new generators. And in this case, your concern was that the discrimination would happen against new generators. So how would an independent entity help that at all? Your Honor, this case is the only one on review. So I can't really speak to what the Commission did in a later order in Dominion. Let's just make it a hypothetical. Well, the Commission could find that if you have an independent entity administering a streamlined interconnection review process, then it could weed out discrimination in the facilitation of that process. But we rested this- But the independent entity that is overseeing the process for existing generators would do nothing to protect new generators, correct? That may be correct, Your Honor. But we did not rest this decision on that principle. So I thought this decision rested on your concern that there would be discrimination against new generators. Exactly. That is correct, Your Honor. And the independent entity does nothing to prevent discrimination against new generators, correct? And I believe that's probably true. I'm not going to prejudice any challenge to the Dominion order which came after this case. But the Court, even in the Ultima decision that P.S. Colorado cites, does not stand for the proposition that this Court will reach out beyond the record here to another case, a subsequent case, where we departed from our policy and the decision on decision on review. And this decision is lawful because we reasonably construed our order, Order 2003, which says that for a non-independent system operator to depart from the default interconnection review process, it has to show that its proposal does as good as or better than the default in not favoring its own generation. Let me, Mr. Fish, share an analogy that's been on my mind. It is admittedly a very imprecise analogy, so I say it with some caution. But I'm trying to think in my head something to compare this to. So the concern here is that, as you said a moment ago, that the entity that Excel may discriminate against new generators in an unfair way. So imagine that there's a principle of law, a Supreme Court precedent, that says in the context of jury selection, old jurors and young jurors are not similarly situated. It's fine to strike old jurors because they're old. It's fine to strike new jurors because they're, you know, young jurors because they're young. I'm not saying that this would be a good precedent at all, but I'm just saying go with me here. Imagine that that's the precedent. The precedent is young jurors, old jurors not similarly situated. And now there's a Batson challenge because an African-American juror struck. The prosecution says, well, we struck that juror because of the juror's age. And the defendant comes back and says, well, that's pretext. I can find another juror, a different race, who is exactly the same who you didn't strike. And the only difference is, other than their race, their age. Now in that situation, it seems like the district judge would have to say, you're not comparing two similarly situated jurors who are different only because of their race. You're comparing jurors who are not similarly situated. One's old, one's young, one's old. Now tell me why that analogy is not like this case. It's not like this case, Your Honor, because just because two, so there you're talking about under one scenario, whether two distinct sets of entities, persons, are similarly situated or not. Here, where the commission found that new and existing resources are not similarly situated was in a totally different context. It was in a different case, considering a different set of issues, where you had an independent system operator, and there, at paragraph 63 of the Mid-Continent Order, we said, in this circumstance, new and existing resources are not similarly situated. Why? Because the issue there was whether, for practical purposes, it made sense to streamline the interconnection reviews for existing generation. And we said, yes, it does. In that way, new and existing are different because existing resources already went through the interconnection review process once before. But here, the issue is whether P.S. Colorado's proposal favors its own generation, of which it owns 60 percent on its grid, under Order 2003. I understand how there are some factual differences here. Tell me how you can still win if I come to the conclusion that the MISO case establishes a principle that new generators and existing generators are not similarly situated. I know you don't think it stands for that principle as broadly as I just stated it, and you might persuade me of that through your briefs and through what you say, but assume, just for the sake of this question, that MISO stands for the principle that existing generators and new generators are not similarly situated. Is there still a way you can win this case? Absolutely, Your Honor, because here, P.S. Colorado, as a non-independent system operator, is not similarly situated to MISO, or Mid-Continent, which is an independent system operator. And that makes all the difference because Order 2003 is all about not allowing transmission providers to benefit their own generation. Well, that immediately distinguishes P.S. Colorado from Mid-Continent because Mid-Continent owns no generation. So there is no specter of Mid-Continent favoring its own resources, whereas here there is. And by the way, it's petitioner's burden under this court's precedent transmission access policy study group, it's petitioner's burden to show that there is no reason for the difference in treatment. I just gave one that goes to the core of Order 2003. And so once we accept that P.S. Colorado, as a non-independent system operator, is not similarly situated to Mid-Continent, which is an independent system operator, then under this court's Baltimore gas precedent, we don't need to explain a different outcome. And so the Mid-Continent case drops out of the equation. And the only question is whether, in this case, we reasonably interpreted our own Order 2003, which says that a deviation from the default procedure must do as good as or better than the default in not allowing a transmission provider to favor its own generation. And from whose perspective? And this is not a hostile question. I'm just asking how the standard works. When you say consistent with or superior to the default procedures, superior to the default procedures from the perspective of who? The commission in implementing the goals of Order 2003. And that is, as Judge Millett was stating, that was to ensure that there is an open marketplace, a competitive marketplace, where new resources are in the same playing field as existing or new resources are in the same playing field as a transmission provider's own resources. And by the way, what P.S. Colorado is arguing here is pretty radical. There is no other case where the commission has said that we find undue discrimination where a transmission provider favors its own resources over independent resources, except where you're only doing so over new resources. You're not discriminating against existing, but it's fine to discriminate in favor of your resources over new resources. We've never said that. And this is a principle of undue discrimination that goes back to at least 1996 with Order 888, where we did there for transmission access what we're doing here for interconnection access. And so it's P.S. Colorado's formulation that is pretty radical. And, you know, just to go back, Judge Walker, I know you're not just going back to my argument that new and existing are not similarly situated for this purpose. I know of no case, and P.S. Colorado has cited none, that says just because two sets of entities are not similarly situated for one purpose means that they're not similarly situated for all purposes. And, you know, here we're talking about a different issue. And if they're correct, then that's a different issue. Can you just finish that thought, spin it out for me? Sure. The issue in mid-continent was whether it made practical sense to allow existing generators to go through a streamlined interconnection review process. And we said yes, for all the reasons P.S. Colorado states, because there are efficiency benefits to that. Okay. And Peter, how are new and existing generators similarly situated in this situation in a way that they were dissimilarly situated in MESA? They are similarly situated here because for purposes of effectuating Order 2003's goal of not allowing transmission providers to favor their own generation resources, it doesn't matter whether we're talking about favoring their own existing generation resources over third-party-owned existing generation resources or favoring their resources over new third-party-owned generation resources. Order 2003 makes no such distinction between existing and new. It's just concerned with preferential treatment of one's own generation resources. I have a quick hypothetical if the court will indulge me. I see I'm over my time. Go ahead. Okay. Thank you, Your Honors. Say a city passes an ordinance that says all motor vehicles should be tested for emissions of carbon dioxide on an annual basis. And the city says, okay, well, we find that electric vehicles and gas-powered vehicles are not similarly situated to effectuate that goal because electric-powered vehicles have no emissions, so we're not going to require electric-powered vehicles to go through annual testing. Later, the city passes another ordinance that says all motor vehicles should have their tire treads tested on an annual basis. We're concerned that smooth tires cause more accidents and cause more injuries. In that circumstance, the electric car manufacturer cannot swoop in and say, wait, you can't apply your tire tread rule to us because you've already said in the emissions context that we are not similarly situated to on the goal and the issue that we're focusing on. The issue here of preferential treatment by a transmission provider simply did not exist in the Mid-Continent case because Mid-Continent owns no resources on its grid, nor could it. It's an independent entity. And, you know, it would- I guess I'm still, I'm sorry, I know you're going to say the jury can't consider it, but in this case, in a subsequent order, you approve a piece Colorado did because they have an independent entity. I think just policing, as Judge Walker was asking, how this process is administered as between existing resources, same thing you did in Dominion. And so what I'm trying to square, and if you want to repeat and just say you can't even think about that, go ahead, but I hope you'll have a better answer than that. And that is, how does that, how does that fix this? I understand the problem you're telling me about here, but I don't understand how PS Colorado have an independent entity fix that problem. Can you help me understand that? Just tell me. There is a bit of daylight. So, you know, as PS Colorado itself argues, you know, in our initial order, we said there may be opportunities for discrimination. There could be opportunities for discrimination. And reasonably, that concern applies in two ways. It applies as concerns existing generation vis-a-vis new generation. And it could also, it could also adhere in a concern over implementation of an otherwise facially neutral policy that applies only to existing generation. So to the extent that we were at all concerned about that other issue here, then the independent administrator in Dominion and the subsequent PS Colorado case, you know, would resolve that. But, you know, I really... Can you point to anything in the orders here that says that was one of the two, that was a dual concern case? You were concerned about discrimination in the administration of this program as between existing generators? Is there anything in either the order or the rehearing order here that talks about that? Not beyond the, what I think would be a paragraph 35 and 36 of our initial order. But I really, you know, I think the stronger and the dispositive argument is this court in Altamont, in Brooklyn Union, in Baltimore Gas, makes very clear that this court does not undermine or does not render unlawful and otherwise lawful order on review just because an agency swerves away in a subsequent order. The only question here is whether we complied with our precedent. And that requires first finding that we are similarly situated to the entities in our prior precedent. I just explained why we're not similarly situated to mid-continent. And if there is no unreason departure from similarly situated entities in our past precedent, then the only question is whether we acted lawfully in interpreting the governing law, which is order 2003 here. And like I said, order 2003. Well, if so, if just procedurally, if PS Colorado goes, okay, now here we are in November 2021, and the wheels are coming off, because FERC let us do it with this independent entity, which isn't addressing at all the problem in either order. And they let Dominion do it with an independent entity, which again, is not addressing this problem of undue preference vis-a-vis new generation. How could PS Colorado go, come to FERC and say, you got to admit now that your concern was not undue preference vis-a-vis new generation. And since that's not, we shouldn't even have to have the independent entity, because you didn't remotely for a second suggest that you were worried about discrimination between the 60, 40 existing generation. How would they do that? I'm not sure that they could do that, Your Honor. I mean, one way might be to challenge the Dominion or its own subsequent PS Colorado order and say, this is unlawful because in the orders on review here, FERC, you didn't say that you need an independent administrator to remedy any perceived undue discrimination. And so the subsequent PS Colorado order is unlawful. It's an unlawful departure from precedence. The only way they can get us to look at this problem, this is a perceived that has now been the order directing independent entity. I think they still have time to do that. I don't, I don't believe they do. I'm trying to remember exactly when, but let's see that, that order was issued back in May. So I don't, I don't believe they do, but they, you know, the writing was certainly on the wall. If they wanted to say that that order is an unreasoned departure from prior precedent, and certainly they would be similarly situated to themselves in the orders on review here, then, you know, then, then there's at least a basis for saying, okay, FERC, you, you committed an unreasoned departure from prior precedent, but I know of no case in this, this court's case log goes sharply the other way. It says a court will reach out to a subsequent decision to render an otherwise lawful order unlawful. So, you know, it's, I think it's an important procedural distinction, but, you know, I would just close by saying their premise that new and existing resources are not similarly situated for all purposes, regardless of the context, just because at paragraph 63 of the mid-continent order, we said in this circumstance, new and existing are not similarly situated is simply erroneous on the law and would undercut our ability to exercise our wide discretion, wide discretion in combating undue discrimination. Thank you, your honors. All right, Mr. Killian, why don't you take two minutes? Thank you. It's not just the MISO order where FERC identified that new and existing are not similarly situated. In paragraph 13 of the rehearing order in our case, FERC reiterated that same finding. FERC has never abandoned the finding that new and existing generation are not similarly situated, not before our case, not in our case, and not after our case, because it's an undeniable truth. The MISO decision... It does go on in that exact same order to say, look, rather, the problem here is... Our participation in the neutral provision, yeah. Rather, the commission sought to ensure that PSCO, as the entity proposing reforms that stands to disproportionately benefit replacement of its own generation, is not afforded, where I began all this, undue preference over developers or owners of third-party generations. So it was drawing the very distinction that Mr. Fish has referenced. As for these purposes, sir, you may be similarly situated, not similarly situated in one sense, but to the extent we have this concern, it continues, or it exists, it is not affected by that difference. And our response, Judge Millett, is that that is not an appropriate concern in this context. When there is an even-handed procedure, it is not unlawful because it's even-handed. So this case boils down to that legal question, whether it's legitimate under the Federal Power Act for them to have that concern about undue preference of their own existing versus new. That's really all that's at issue. That is the first-order issue, yes. That somehow violates the Act in order, by our compliance with the Act and treating everybody equally. We treat everyone the same, including ourselves, and therefore we violate the Act. We challenge that logic as arbitrary and capricious. Mr. Killian, can you respond to Mr. Fish? Do you agree with Mr. Fish that we can't look at the orders that occurred after this order? We just have to cover our eyes? No, we do disagree with that. What's your authority for disagreeing? Because he does have some solid precedents on his side there. Sure. And the cases he cites are cases where an entity who lost in its case points to subsequent cases, usually years after the fact, and say, hey, agency, you affirmatively changed your policy. Apply that retroactively to me. But in our situation, the order, number one, came out a few weeks afterwards. The Dominion order was a few weeks afterwards. And in that Dominion order, there are several paragraphs where FERC is purporting to talk about our order. FERC completely recharacterizes the 26th of the Dominion order and says, actually, this was all just about discrimination against other existing generators. And as Judge Millett noted, and as then Chairman Danley noted in his concurrence, that doesn't appear on the face of our orders at all. A concern about PSCO somehow applying these procedures in a way that discriminates in favor of its affiliates and against unaffiliated existing generators was a concocted rationale. And so we point to the is just bouncing around. Every time they get pushed on this, they come up with a brand new argument. And in this court, we think they're advocating a new argument as well, that the mere participation in a neutral benefit somehow renders it discriminatory or unduly preferential. The essential logic about- Why wasn't your avenue at that point, I understand your argument. Why wasn't your avenue then to seek review through the order approving a plan with the addition of an independent entity and go look? We're getting hit from every direction. We don't know what's going on. I have to say, Judge Millett, I've never seen someone who petitioned for something and obtained exactly what they petitioned for, then file a petition for review in this court and saying, I shouldn't have asked for what I got for. I know, but you're a good lawyer. You could explain why you're actually still injured. I would do my best to that situation, Judge Millett, but I do think that it would present some serious questions that you're seeking out a petition for review, something that you did not ask the agency for in the first instance. We asked for it. We did it in this proceeding and we were rejected in this- Could you have not... Did you file another... Sorry. Did you file another application to have it approved with the independent entity? We did. That was the one- Could you have not then at that application stage said two things. One, we think you should go back and reconsider your initial decision in light of what you just did in Dominion Power, because these are not making sense to us. Or two, if you can make it make sense, then approve it with the independent entity. You could have done a two-track approach in that application that would have allowed you to bring the Dominion story into the record and into the analysis we're going for. I'm not sure, Judge Millett, that we could have done something like that. So given that we're in this case right here, where we did raise exactly these arguments, I do think we're not saying that FERC consciously changed policy in the Dominion case and that that conscious policy change should be applied retroactively to our benefit. What we're saying is that FERC has treated us differently. The APA principle of treating like cases alike does not require the court to turn a blind eye to the in a few weeks afterwards and purporting to give an explanation for our decision that doesn't even withstand the actual assertions in our own decision. If I can conclude, Your Honors, Order 2003 is not anti-integrated utilities and neither are Section 205 and 206. The solution that all the statute and the Order 2003 proposed for integrated utilities was to require equal treatment. That is exactly what PSCO has proposed in this situation. And compliance with the statute somehow violates the statute as arbitrary, capricious, and contrary to law. All right. Thank you, counsel. Madam Clerk, would you call the next case?
judges: Henderson, Millett, Walker